PEOPLE v SCHUMACHER

Docket No. 267624. Submitted June 5, 2007, at Grand Rapids. Decided
June 28, 2007, at 9:00 a.m. Leave to appeal sought.

Kenneth D. Schumacher and Alternative Fuels, L.C., were charged in
the 77th District Court with violating MCL 324.16902(1), which
concerns the unlawful disposal of scrap tires. They were convicted
following a jury trial, Susan H. Grant, J. The Mecosta Circuit
Court, Scott Hill-Kennedy, J., reversed the conviction of Alterna-
tive Fuels because of a lack of service, but affirmed Schumacher's
conviction. Schumacher appealed by leave granted.

The Court of Appeals *held*:

1. There was sufficient evidence to prove beyond a reasonable
doubt that Schumacher violated the statute. While MCL
324.16902(1) is silent with regard to a *mens rea* requirement, the
statute requires only that the prosecution prove that a defendant
purposefully or voluntarily performed the wrongful act. The
statute did not codify a common-law crime, and the offense fits the
description of a public-welfare crime. The statute contains no
language from which it may be inferred that guilty knowledge is a
required element. The prosecution presented sufficient evidence
for a rational fact-finder to conclude that Schumacher knowingly
and voluntarily caused more than 500 scrap tires to be delivered to
an improper disposal area. Moreover, while that unlicensed dis-
posal area could lawfully operate without license as a solid-waste
transfer station under MCL 324.11501 *et seq.* for some purposes,
Schumacher was convicted under MCL 324.16902(1), which re-
quired him to deliver the scrap tires only to a licensed disposal area
or another place specified in the statute.

2. Schumacher was not denied due process. Due process re-
quires the prosecution to provide a defendant with material
exculpatory evidence that the prosecution possesses, regardless of
whether the defendant requests the disclosure. The letter that
Schumacher alleges the prosecution failed to give him, however,
did not indicate that the collection site Schumacher used was a
licensed disposal area.

3. Schumacher did not establish plain error affecting his
substantial rights with regard to alleged prosecutorial misconduct.

4. Before the prosecution's witness testified regarding Schumacher's admissions, the prosecution properly established the *corpus delicti* of the crime by direct and circumstantial evidence independent of Schumacher's admissions. The prosecution established (1) the occurrence of the specific injury and (2) some criminal agency as the source of the injury. Schumacher's admissions went more to establishing his identity as a person responsible for the offense rather than being a confession of guilt, and issues concerning the prosecution's mode and order of presenting the evidence could have been cured following a timely objection.

Affirmed.

ENVIRONMENT — CRIMINAL LAW — DISPOSAL OF SCRAP TIRES — KNOWLEDGE REQUIREMENT.

The statute prohibiting the improper disposal of scrap tires requires only that the prosecution prove that the defendant purposefully or voluntarily performed the prohibited act (MCL 324.16902[1]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Heather S. Meingast*, Assistant Attorney General, for the people.

*Foster, Swift, Collins & Smith, P.C.* (by *Webb A. Smith* and *Pamela C. Dausman*), for Kenneth D. Schumacher.

Before: KELLY, P.J., and MARKEY and SMOLENSKI, JJ.

MARKEY, J. Defendant Kenneth D. Schumacher appeals by leave granted the circuit court's order affirming his conviction after a jury trial on a charge of unlawful disposal of scrap tires.[1] The trial court sentenced defendant as a second or subsequent offender to 270 days in jail and a $10,000 fine. MCL 324.16909(3). Although the circuit court affirmed defendant's conviction, it granted defendant bail pending appeal and otherwise stayed the sentence. We affirm.

---

[1] The circuit court reversed the conviction of Schumacher's codefendant, Alternative Fuels, L.C., on the basis of a lack of service, and it is not a party to this appeal. Consequently, our reference to "defendant" in this opinion is to Schumacher.

Defendant was convicted of violating § 16902(1) of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, which is set forth in part 169 of that act, MCL 324.16901 *et seq.* At the time of the offense,[2] § 16902(1), MCL 324.16902(1), provided:

> A person shall deliver a scrap tire only to a collection site registered under section 16904, a disposal area licensed under part 115, an end-user, a scrap tire processor, a tire retailer, or a scrap tire recycler, that is in compliance with this part.

Defendant first argues that the prosecution presented insufficient evidence to sustain his conviction. This claim requires that we review de novo the trial evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that all the elements of the offense were proved beyond a reasonable doubt. *People v Tombs*, 472 Mich 446, 459; 697 NW2d 494 (2005). Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Moreover, in reviewing a sufficiency-of-the-evidence claim, we must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the jury verdict. *Id.*

First, defendant argues that there was insufficient evidence to prove beyond a reasonable doubt that he knowingly violated the statute. The parties dispute whether § 16902(1) imposes strict liability or requires proof of scienter, i.e., that a person knowingly violated its terms, before a conviction may be sustained. Second,

---

[2] We refer to the versions of the statutes in effect at the time of the offense, which was in September 2003.

defendant argues on the basis of his interpretation of § 16902(1) and part 115 of NREPA, MCL 324.11501 *et seq.*, that he did not violate the statute. Defendant's arguments raise issues of statutory interpretation, which are questions of law that this Court reviews de novo. *Tombs, supra* at 451. The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). If the statutory language is unambiguous, we presume that the Legislature intended the meaning expressed, and the statute must be enforced as written. *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999). "We must give the words of a statute their plain and ordinary meaning, and only where the statutory language is ambiguous may we look outside the statute to ascertain the Legislature's intent." *Id.*

We address first whether the statute requires as an element necessary for criminal liability that the accused knowingly violate its terms: Does the statute require proof of *mens rea*, or is it a strict-liability offense? "As a general rule there can be no crime without a criminal intent." *Tombs, supra* at 466 (TAYLOR, C.J., concurring), citing *People v Roby*, 52 Mich 577, 579; 18 NW 365 (1884) (COOLEY, C.J.). Nevertheless, "[a]lthough strict-liability offenses are disfavored, the Legislature has firmly rooted authority to create such offenses." *People v Adams*, 262 Mich App 89, 91; 683 NW2d 729 (2004). Furthermore, the Legislature has no constitutional obligation to require proof of *mens rea* before imposing criminal liability for certain conduct. *People v Quinn*, 440 Mich 178, 185; 487 NW2d 194 (1992). Thus, the focus of our inquiry into whether § 16902(1) imposes strict liability is to ascertain what mental culpability the Legislature intended for a conviction for its violation. *Id.*

The requirement of having *mens rea*, or criminal intent, to establish criminal culpability has deep roots in our common-law tradition. *Morissette v United States*, 342 US 246, 250-252; 72 S Ct 240; 96 L Ed 288 (1952). "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion." *Id.* at 250. Thus, when state legislatures began codifying common-law offenses, courts held that criminal intent was a necessary element even if the statute was silent on the subject. *Id.* at 252. But the *Morissette* Court recognized exceptions to this rule of statutory construction: for example, "sex offenses, such as rape, . . . [and] offenses of negligence, such as involuntary manslaughter or criminal negligence and the whole range of crimes arising from omission of duty." *Id.* at 251 n 8. The *Morissette* Court also approved strict liability for so-called "public welfare offenses" that had "very different antecedents and origins" than the common law. *Id.* at 252, 255. These criminal laws instead grew out of the need to regulate modern society after the Industrial Revolution. *Id.* at 252-256. The growth of society and technology "engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." *Id.* at 254. The *Morissette* Court opined that many so-called public-welfare offenses "do not fit neatly into . . . accepted classifications of common-law offenses, . . . but are in the nature of neglect where the law requires care, or inaction where it imposes a duty." *Id.* at 255. Further, the Court recognized that "[m]any violations of such regulations result in no direct or immediate injury to person or property but

merely create the danger or probability of it which the law seeks to minimize." *Id.* at 255-256. Thus,

> whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. [*Id.* at 256.]

See, also, *Roby, supra* at 579 ("Many statutes which are in the nature of police regulations . . . impose criminal penalties irrespective of any intent to violate them; the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible.").

In *Quinn,* our Supreme Court applied *Morissette* to MCL 750.227c to determine if the statute required proof of knowledge that the firearm was loaded as well as knowledge of its possession to sustain a conviction for transporting or possessing in a vehicle a loaded firearm other than a pistol. The Court first noted that if, as in this case, "the offense in question does not codify a common-law offense and the statute omits the element of knowledge or intent," the intent of the Legislature controls whether the offense requires proof of criminal intent. *Quinn, supra* at 186. The Court concluded that the Legislature intended that criminal culpability could arise "regardless of the actor's intent" and that the Court's construction of the statute "comports with the purpose of public welfare regulation to protect those who are otherwise unable to protect themselves by placing 'the burden of acting at hazard upon a person otherwise innocent but standing in

responsible relation to a public danger.' " *Id.* 186-187 (citation omitted).

In *Adams*, this Court analyzed MCL 750.165 to determine whether felony nonsupport is a strict-liability offense. The *Adams* Court noted several factors to consider in determining whether the Legislature intended an otherwise silent statute to nevertheless require fault as a predicate to guilt:

> (1) whether the statute is a codification of common law; (2) the statute's legislative history or its title; (3) guidance to interpretation provided by other statutes; (4) the severity of the punishment provided; (5) whether the statute defines a public-welfare offense, and the severity of potential harm to the public; (6) the opportunity to ascertain the true facts; and (7) the difficulty encountered by prosecuting officials in proving a mental state. [*Adams, supra* at 93-94.]

Applying the *Adams* factors to § 16902(1), we conclude that even if the Legislature did not intend to create true strict liability, § 16902(1) at most requires only that the prosecution prove that defendant "purposefully or voluntarily performed the wrongful act . . . ." See *People v Lardie*, 452 Mich 231, 241; 551 NW2d 656 (1996) (discussing "the distinction between a strict-liability crime and a general-intent crime"), overruled on other grounds by *People v Schaefer*, 473 Mich 418 (2005).

First, § 16902(1) does not codify a common-law crime. Rather, NREPA is a comprehensive statutory scheme containing numerous parts, all intended to protect the environment and natural resources of this state. See *Neal v Wilkes*, 470 Mich 661, 674; 685 NW2d 648 (2004) (CAVANAGH, J., dissenting), and *Genesco, Inc v Michigan Dep't of Environmental Quality*, 250 Mich App 45, 52-53; 645 NW2d 319 (2002). Part 169 of NREPA is itself a comprehensive regulatory measure to

protect the public health, safety, and welfare from the increasing dangers of fire hazards and environmental damage attributed to growing stockpiles of scrap tires in our motor-vehicle-based society. Also, a violation of part 169 is only a misdemeanor with relatively minor penalties ranging from "imprisonment for not more than 90 days or a fine of not less than $200.00 or more than $500.00, or both," for a violation involving fewer than 50 tires, to "imprisonment for not more than 180 days or a fine of not less than $500.00 or more than $10,000.00, or both," for violations involving 50 or more tires. MCL 324.16909(1) and (2). Only second or subsequent offenders, such as defendant, may be punished by "imprisonment for not more than 1 year or a fine of not less than $1,000.00 or more than $25,000.00, or both . . . ." MCL 324.16909(3). Therefore, the offense contained in § 16902(1) fits the description of a public-welfare offense discussed by the United States Supreme Court in *Morissette*.

Second, the Legislature has nowhere included in part 169 a requirement that criminal culpability depend on the actor "knowingly" violating its terms. We note that in *Tombs*, Justice KELLY, writing for a majority on this issue, opined: "Absent some clear indication that the Legislature intended to dispense with the requirement, we presume that silence suggests the Legislature's intent not to eliminate *mens rea*" in the statute involved. *Tombs, supra* at 456-457. But the Court did not rely entirely on this presumption in holding that MCL 750.145c(3), which makes the distribution or promotion of child sexually abusive material a 20-year felony, "requires that an accused be shown to have had criminal intent to distribute or promote." *Tombs, supra* at 448. Rather, the Court held that the Legislature had affirmatively required criminal intent by using the

words "distribute" and "promote." Discussing the meaning of these words, Justice KELLY wrote:

> The most applicable dictionary definition of "distribute" implies putting items in the hands of others as a knowing and intentional act. Likewise, the terms "promote" and "finance," and the phrase "receives for the purpose of distributing or promoting" contemplate knowing, intentional conduct on the part of the accused.
>
> The use of these active verbs supports the presumption that the Legislature intended that the prosecution prove that an accused performed the prohibited act with criminal intent. [*Id.* at 457.]

In contrast, § 16902(1) contains no language from which it may be inferred that guilty knowledge is a required element for offending its mandate, which provides that "[a] person shall deliver a scrap tire only to a collection site registered under section 16904, a disposal area licensed under part 115, an end-user, a scrap tire processor, a tire retailer, or a scrap tire recycler, that is in compliance with this part." MCL 324.16902(1). Likewise, § 16909 states merely that a person "who violates this part" may be punished as specified previously. MCL 324.16909(1) and (2).

In the present case, the evidence was sufficient for a rational fact-finder to conclude that defendant knowingly and voluntarily caused more than 500 scrap tires to be delivered to Robinson Farms. Defendant admitted as much to Department of Environmental Quality (DEQ) investigator Terrance Hartman, who testified that defendant indicated that he had directed 9 or 10 loads of scrap tires to the location. Further, Alternative Fuels operations manager Mashelle Sager testified that defendant was the fuel coordinator who made sure that "tires come in and fuel goes out[.]" On the other hand, Sager testified that, although she did not believe that

Robinson Farms was a licensed scrap-tire facility under part 169, she did believe that it "was a landfill under Part 115." Similarly, Kamala Robinson testified that she believed that Robinson Farms was "legal" and that when defendant asked her if she was allowed to take the tires, she told him: "Yes. I'm a dump." Thus, defendant's claim is not that he did not cause the scrap tires to be delivered to Robinson Farms, but that he did not realize his actions were illegal. Consequently, this case is factually distinguishable from *Tombs* because the defendant in that case never expected that the child sexually abusive material on the laptop he returned to his employer would be viewed by anyone; he thought it would be erased. See *People v Hill*, 269 Mich App 505, 521-523; 715 NW2d 301 (2006) (distinguishing *Tombs* because the defendant intentionally created compact discs containing child sexually abusive material but claimed he did not realize his acts were illegal). "*Tombs* does not stand for the proposition that ignorance of the law supports a reduction or dismissal of charges." *Id.* at 523.

The plain language of § 16902(1) places the burden on the person delivering scrap tires to determine that the recipient site is one of the enumerated lawful places to dispose of scrap tires. Rather than relying on Kamala Robinson's assurances, defendant could easily have discovered that the site's last license for accepting waste expired in 1972 and that neither the local health department nor the state of Michigan had issued a permit for the site for almost 30 years. Thus, defendant had "the opportunity to ascertain the true facts," and this case demonstrates "the difficulty encountered by prosecuting officials in proving a mental state." *Adams, supra* at 94. Accordingly, we conclude that the Legislature intended in § 16902(1) to establish a so-called public-welfare offense: the only intent necessary to

establish its violation is that the accused intended to perform the prohibited act. *Morissette, supra* at 253-256; *Roby, supra* at 579. The evidence presented at trial was more than sufficient for a rational jury to find that defendant knowingly and voluntarily caused more than 500 scrap tires to be delivered to Robinson Farms, which was not "a collection site registered under section 16904, a disposal area licensed under part 115, an end-user, a scrap tire processor, a tire retailer, or a scrap tire recycler, that is in compliance with" part 169 of NREPA. MCL 324.16902(1).

Defendant next argues that he did not violate § 16902(1) because Robinson Farms could lawfully operate without a license as a "Type B" transfer station under part 115 of NREPA. Defendant relies on § 11529(1) of part 115 of NREPA, which provides in pertinent part:

A disposal area that is a solid waste transfer facility is not subject to the construction permit and operating license requirements of this part if either of the following circumstances exists:

(a) The solid waste transfer facility is not designed to accept wastes from vehicles with mechanical compaction devices.

(b) The solid waste transfer facility accepts less than 200 uncompacted cubic yards per day. [MCL 324.11529(1).]

Defendant equates the fact that Robinson Farms could lawfully operate *without a license* as a "Type B" transfer station under part 115 with being "a disposal area *licensed* under part 115" within the meaning of § 16902(1). (Emphasis added.) We reject defendant's interpretation of § 16902(1) as being contrary to its plain terms. Although a solid-waste transfer facility may be a "disposal area" under part 115, MCL 324.11503(4)(a), Robinson Farms' ability to operate

lawfully under § 11529(1) without a license to receive small-scale solid waste does not confer on it a license to do so. Rather, Robinson Farms is exempted from the licensing requirements of part 115, providing that it limits its activity to that specified in § 11529(1) and otherwise complies "with the operating requirements of this part and the rules promulgated under this part." MCL 324.11529(2). In sum, the evidence at trial established that Robinson Farms was not licensed under part 115 of NREPA, and no evidence that Robinson Farms could do certain things lawfully without a license changes that fact. Because Robinson Farms was not licensed under part 115, it was not "a disposal area licensed under part 115" within the meaning of MCL 324.16902(1). Defendant's sufficiency-of-the-evidence argument based on his construction of the statute fails.

Next, defendant argues that he was denied due process by the prosecution's failure to provide him exculpatory information until after his trial. Due process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the disclosure. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). We review de novo defendant's constitutional due process claim. *People v Izarraras-Placante*, 246 Mich App 490, 493; 633 NW2d 18 (2001).

Defendant argues that a posttrial, January 31, 2005, letter from the DEQ to Alternative Fuels advising that the DEQ would grant Alternative Fuels' application for registration as a scrap-tire hauler establishes that the DEQ was satisfied with the status of the Robinson Farms site. Defendant contends the letter demonstrates that the Robinson Farms site satisfied § 16902(1) because the letter stated: "Disposal of tires at a sanitary

landfill must comply with Part 115, Solid Waste Management, of the NREPA." We disagree with defendant's reading of the January 31, 2005, letter. The letter nowhere indicates that Robinson Farms is or was at the time of the violation "a disposal area licensed under part 115 . . . that is in compliance with" part 169 of NREPA. MCL 324.16902(1). Consequently, defendant has failed to establish any of the elements necessary to prove a *Brady* violation, which are "(1) that the state possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could the defendant have obtained it with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005).

Next, defendant argues that he was denied his constitutional right to not be compelled to be a witness against himself in a criminal trial. US Const, Am V ("No person shall be . . . compelled in any criminal case to be a witness against himself . . . ."); see, also, Const 1963, art 1, § 17 ("No person shall be compelled in any criminal case to be a witness against himself . . . ."). The essence of defendant's argument is that he was forced to choose between either testifying to rebut the prosecution's theory of the case that defendant and Alternative Fuels were one and the same or exercising his right to not testify. Alternatively, defendant argues that he was denied a fair trial by the prosecutor's misconduct. Because defendant failed to object at trial to the prosecution's argument and evidence regarding this issue, our review is for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant offers no argument on how his situation differs from that of every other person against whom the government brings criminal charges, nor does he offer any authority to support his novel claim that the dilemma an accused faces in deciding whether to testify implicates the constitutional guarantee prohibiting compelled self-incrimination. " 'An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority.' " *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001), quoting *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Accordingly, defendant has abandoned his constitutional claim. *Watson, supra* at 587.

Likewise, defendant's argument that the prosecutor engaged in misconduct is without merit. The prosecutor presented evidence from which an inference could be drawn that defendant controlled Alternative Fuels, even if he was not an owner or member. The prosecutor stated at the beginning of the trial, "I would argue to you—or submit to you at this time—that the evidence will show that really, Ken Schumacher is Alternative Fuels." In closing argument, the prosecutor stated:

> You heard two witnesses from the State that they believed—all right—through their—all their dealings with Alternative Fuels that who is and what is Alternative Fuels? Ken Schumacher is Alternative Fuels. He's the one calling the shots over there. We find out that . . . he determines what tires are coming in and what tires are going out.

Although a prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, *Stanaway, supra* at 686, he or she is free to argue the evidence and all reasonable inferences arising from it as

they relate to the prosecution's theory of the case, *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *Watson, supra* at 588. Consequently, defendant has failed to establish that plain error affected his substantial rights. *Carines, supra* at 763-764.

Defendant next contends that the prosecution improperly elicited legal opinions from DEQ investigator Hartman regarding whether the Robinson Farms site complied with parts 115 and 169 of NREPA, i.e., whether it was a lawful place to dispose of scrap tires. Defendant argues that the testimony invaded the province of the trial court to instruct the jury regarding the law, see *People v Drossart*, 99 Mich App 66, 75-76; 297 NW2d 863 (1980), and caused juror confusion. Defendant failed to object to Harman's testimony at trial, and so we review this issue for plain error affecting defendant's substantial rights. *Carines, supra* at 763-764.

In general, a witness may not testify on questions of law because it is the trial court's responsibility to determine the applicable law. *People v Dewald*, 267 Mich App 365, 377; 705 NW2d 167 (2005). Hartman was the DEQ's chief investigator and the instigator of the criminal charges against defendant. The testimony that defendant finds objectionable was Hartman's explanation why he believed that § 16902(1) had been violated. We conclude that this testimony did not affect defendant's substantial rights for several reasons. First, we have already rejected defendant's interpretation of § 16902(1): that Robinson Farms' ability to operate as an unlicensed "Type B" transfer station authorized it to receive scrap tires. Second, defendant was permitted to cross-examine Hartman regarding his, and the prosecution's, theory of the case. Furthermore, defendant was allowed to present his own public-health expert to testify regarding the pertinent statutory pro-

visions. Defendant does not contend that the trial court improperly instructed the jury, which was free to accept or reject any witness's testimony. See *Dewald, supra* at 377. Finally, from the fact that criminal charges were instituted, the jury was already aware that Hartman must have believed that the disposal of more than 500 scrap tires at Robinson Farms was unlawful. See *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). For all these reasons, we conclude that defendant has not established that plain error affected his substantial rights. *Carines, supra* at 763-764.

Last, defendant argues that the prosecution improperly introduced defendant's alleged confession into evidence before establishing the *corpus delicti* of the charged offense. Because defendant did not contemporaneously object to Hartman's testimony regarding defendant's statements, our review is limited to whether plain error affected defendant's substantial rights. MRE 103(a) and (d); *People v Ish*, 252 Mich App 115, 116; 652 NW2d 257 (2002).

In a criminal prosecution, proof of the *corpus delicti* of a crime is required before the prosecution may introduce a defendant's inculpatory statements. *People v McMahan* 451 Mich 543, 548; 548 NW2d 199 (1996). "The corpus delicti rule is designed to prevent the use of a defendant's confession to convict him of a crime that did not occur." *People v Konrad*, 449 Mich 263, 269; 536 NW2d 517 (1995). Under the *corpus delicti* rule, "a defendant's confession may not be admitted unless there is direct or circumstantial evidence independent of the confession establishing (1) the occurrence of the specific injury . . . and (2) some criminal agency as the source of the injury." *Id.* at 269-270. Proof of the identity of the perpetrator of the crime is not part of the *corpus delicti. Id.* at 270. Moreover, the *corpus delicti*

rule does not bar admissions of fact that do not amount to a confession of guilt. *People v Rockwell*, 188 Mich App 405, 407; 470 NW2d 673 (1991). "If . . . the fact admitted does not of itself show guilt but needs proof of other facts, which are not admitted by the accused, in order to show guilt, it is not a confession, but an admission . . . ." *People v Porter*, 269 Mich 284, 290; 257 NW 705 (1934).

At trial, the prosecution's first witness was Rhonda Zimmerman, chief of DEQ's solid-waste-management unit. Zimmerman testified that Robinson Farms, at the time of the offense, was neither a registered scrap-tire collection site under part 169 nor a disposal area licensed under part 115 of NREPA. Next, Hartman testified that he went to Robinson Farms in response an anonymous tip that scrap tires were being improperly disposed of at the site. Hartman testified that, at the site, he observed several dumpsters and a pile of debris on the ground; he followed fresh tire tracks to the back of the property, where he found a large truck with a sign that said "Alternative Fuels," behind which was a large pile of tires. Hartman stated that Carl Allbee was the driver of the truck and was unloading scrap tires. Hartman testified that he went to the office of Alternative Fuels and introduced himself to defendant. He asked defendant why he was delivering scrap tires to the Robinson Farms site. According to Hartman, defendant stated that he was under a contract to take the tires to the property for the purpose of building a road and that there had been 9 or 10 loads of tires delivered to the site. Later in his testimony, Hartman stated that there were more than 500 scrap tires at the Robinson Farms site.

This record demonstrates that, before Hartman testified regarding defendant's admissions, the prosecution had introduced direct and circumstantial evidence

independent of the admissions "establishing (1) the occurrence of the specific injury . . . and (2) some criminal agency as the source of the injury." *Konrad, supra* at 270. Specifically, from the testimony of Zimmerman and Hartman, apart from defendant's statements, it could be inferred that a large quantity of scrap tires had been deposited at a site that was neither a registered scrap-tire collection site under part 169 nor a disposal area licensed under part 115 of NREPA. Defendant's admissions went more to establishing his identity as a person responsible for the offense rather than being a confession of guilt. *Konrad, supra* at 270. Further, to the extent that defendant's statement provided evidence regarding the quantity of scrap tires at Robinson Farms site before Hartman testified about his own observations, the issue is one only of the mode and order of presenting the evidence. Had defendant raised a contemporaneous objection, the prosecution could have easily presented the additional independent evidence before presenting Hartman's testimony regarding defendant's admissions. Accordingly, defendant has failed to establish that plain error affected his substantial rights. *Carines, supra* at 763-764.

We affirm.