# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JACKIE DALE MCCONNELL,

Defendant-Appellant.

UNPUBLISHED
January 28, 2016

No. 323800
Calhoun Circuit Court
LC No. 2014-000688-FC

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

Defendant was convicted of second-degree murder, MCL 750.317, arising out of the beating death of his girlfriend. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 60 to 90 years' imprisonment, and brings this appeal as of right. For the reasons set forth in this opinion, we affirm the conviction and sentence of defendant.

## I. BACKGROUND

Defendant and the victim in this case, Donna Frost, dated for several months and lived together in a house in Albion that defendant rented. Frost's daughter, Renee Farrier, testified that Frost had numerous medical conditions, including "ulcers in her stomach," "something wrong with her blood pressure," and anemia. Defendant admitted that Frost was small and frail.

There was testimony that defendant and the victim drank heavily, leading at times to verbal and physical altercations. At some point before her demise, Frost's family and friends gathered to conduct what they classified as an "intervention" to try and coax Frost into leaving defendant. This proved unsuccessful despite the fact that the victim confided to her sister, Deborah McConnell[1], that defendant had physically abused her in the past.

Deborah testified that she became concerned about Frost in January 2014 "[b]ecause [she] was told that Jackie [defendant] was—hasn't been seen and that the people that were living

---

[1] Testimony revealed that the victim's sister was married to defendant's brother.

with him said that Donna wasn't there for over a week." Deborah told her husband about her concerns and he contacted the Albion police.

Albion Department of Public Safety Officer Richard Decker testified that he did a "welfare check" on defendant's house on January 20, 2014, after Frost's family members "had not heard from her for several days . . . [and] requested that [he] accompany them to the house to see if she was there, and if so, to check on her condition." They found no one there but a dog.

Albion Department of Public Safety Detective Luis Tejada testified that after talking with members of Frost's family, he "determined that there was too many red flags going on," explaining that he "realized that [Frost] did not have the physical means to just get up and walk away from that residence." This led to a second "welfare check" on the home where again, police were unable to find defendant and no evidence was gleaned from their entry.

Eventually, police surmised that defendant had been in North Carolina visiting his nephew, Brandon Russell. Tejada and the other officers "decided to—at least three or four of [them] needed to go down there and interview Brandon Russell and his live-in partner Mr. Henry to find out what happened to Jackie." When they arrived in North Carolina, Tejada called defendant and defendant agreed to come to a local police station to meet with them. Tejada testified that he advised defendant of his *Miranda*[2] rights and that defendant signed a waiver form and agreed to talk with him. The interview, which took place on January 26, 2014, was videotaped, and a portion of the video was played at trial. In the video, defendant initially denied knowing Frost's whereabouts, but upon further questioning said: "Let's cut the bullshit." Defendant then told Tejada that Frost was "[a]t Blake's Tree Farm in a hole."[3] Defendant explained that he and Frost were both naked because they had just finished having sex and they then got into "a bad fight" and he "hit her too hard" with his fist. Defendant said that after he hit her, he dressed her, put her in bed, and lay with her for a couple hours. He said that he then put her in the trunk of his car and drove to his sister's house, and when she was not home defendant admitted that he then dumped Donna Frost in the pit.

Tejada also testified about defendant's statements that were not on the video played to the jury. He testified that defendant said that he had "hit [Frost] really hard on the face/head area with his hands . . . ." Tejada also testified that defendant "said that there was a little bit of blood . . . [and] some injuries here on this side of the face." Tejada testified that defendant said that after he hit Frost, she was not breathing and did not have a pulse, but chose not to call 9-1-1 because defendant thought Frost to be dead. However, Tejada added that defendant "mentioned during the interview that he was hoping that [Frost] was knocked out, that she—it was just all a nightmare, but he realized that she was dead, she was gone." Tejada testified that according to

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] Tejada described the hole as follows: "It's more of a pit, 30 feet wide, 20 feet long, and about 10 feet deep that they use to burn tree trunks, boards, debris, mattresses, anything that they throw in there, they burn it up. It's just a burning pit."

his conversation with defendant, the time of Frost's death was January 14, 2014 between midnight and 2:00 a.m. or 3:00 a.m.

Based on the information provided to police, Frost's body was discovered and an autopsy was performed. Dr. Brandi Shattuck, a forensic pathologist, who was qualified at trial as an expert in that field testified that she performed the autopsy on Frost. Shattuck testified that there was "a laceration on the right forehead," a "contusion, which is a bruise, adjacent to that area," and "ecchymosis, which is discoloration or a bruise around the eyes." She also testified that there were abrasions on Frost's torso and back. Regarding the lacerations on Frost, Shattuck testified that "[t]here was no pattern" and that she "couldn't tell you if it was anything other than something blunt." She also testified that there were no defensive wounds on Frost's hands.

Shattuck testified that her internal examination revealed "two areas of healing fracture and one area of perimortem fracture" on the left and right ribs, explaining that a "perimortem" fracture "happens on or around the—the time of death." She testified that there were also "multiple areas of hemorrhage in the soft tissue of the scalp."

Shattuck determined that the cause of death was "blunt injury to the head" and classified it as a homicide. As the "cause of death" on the death certificate, Shattuck stated, "Blunt force injuries of head with or without associated hypothermia"[4]. Shattuck concluded that she arrived at the cause of death because of the injuries, defendant's confession, and the fact that she had "no other competing mechanism for that trauma."

Defendant was convicted and sentenced as indicated above. This appeal then ensued.

II. ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant first argues that there was insufficient evidence to establish the requisite intent for second-degree murder. Specifically, defendant argues that there was insufficient evidence from which the jury could find the element of malice beyond a reasonable doubt.

When examining whether there was sufficient evidence to support a conviction, the evidence is reviewed de novo in a light most favorable to the prosecution to determine "whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010). We will not interfere with the role of the trier of fact in determining "'the weight of the evidence or the credibility of witnesses.'" *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012), quoting *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Further, we

---

[4] Tejada testified that the weather during that time had been "in the single digits, really cold," and there was "at least a foot of snow on the ground and continual falling snow."

are mindful that "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Murder is "the unlawful killing of one human being by another with malice aforethought." *People v Goecke*, 457 Mich 442, 463; 579 NW2d 868 (1998). The elements of murder in the second degree are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *Id*. at 463-464. As previously noted, defendant's argument focusses on malice, which "is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. at 464. The intent to do great bodily harm is "otherwise described as the intent to do serious injury of an aggravated nature . . . ." *People v Brown*, 267 Mich App 141, 149; 703 NW2d 230 (2005). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Kanaan*, 278 Mich App at 622. See also *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) ("Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." [Internal quotation marks and citation omitted]).

Our review of the evidence presented at trial, viewed in the light most favorable to the prosecution, reveals that the trier of fact could find the element of malice beyond a reasonable doubt. Initially we note that the evidence presented to the jury could reasonably have led them to conclude beyond a reasonable doubt that the victim was subjected to a severe beating. See *People v Thomas*, 85 Mich App 618, 624; 272 NW2d 157 (1978) (holding that the defendant's "savage and brutal beating" of the victim established that the defendant "intended to beat the victim and the natural tendency of defendant's behavior was to cause great bodily harm"). Defendant stated that he and Frost had gotten into "a bad fight," and he admitted that he "hit her too hard." We also note the great disparity in size between defendant, who was approximately 5 feet 10 inches tall and weighed 205 pounds, and Frost, who was approximately 4 feet 11 inches tall and weighed 80 pounds. Defendant admitted that he knew that she was frail. Indeed, Frost's daughter testified that Frost was unable to walk because defendant had shattered her ankle.

Shattuck concluded that the cause of death was "[b]lunt force injuries of head with or without associated hypothermia." Although she was unable to say whether the trauma was caused by multiple blows or only one, and she gave no indication about the amount of force with which the trauma was inflicted, the injuries to Frost's ribs suggested that defendant had inflicted a prolonged beating. Shattuck testified that the "healing fracture" could have occurred days before death and the perimortem fracture could have occurred several hours after death.

Additionally, the evidence presented indicated that defendant did not seek any assistance after striking the victim. Rather, he allowed her to remain in the home without any medical attention. While defendant testified that he believed the victim to be dead, the jury was free to believe or disbelieve that evidence, especially considering the evidence offered by Shattuck that is was possible that defendant placed Frost in the pit knowing that she was still alive. See *People v Magyar*, 250 Mich App 408, 418; 648 NW2d 215 (2002) (finding sufficient evidence of malice where the defendant "intentionally struck the child victim on the head so forcefully as to cause

-4-

serious brain damage and then knowingly brought about the circumstances that led to her death when he delayed medical treatment").

From the record it is clear that considered in the aggregate, there existed sufficient evidence from which the jury could find the element of malice beyond a reasonable doubt. The state introduced acts committed by defendant against the victim which, if believed, proved beyond a reasonable doubt that defendant possessed the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. Accordingly, viewing this evidence in the light most favorable to the prosecution and given that "minimal circumstantial evidence will suffice to establish the defendant's state of mind," *Kanaan*, 278 Mich App at 622, this evidence sufficed to establish that defendant intended to do at least serious injury of an aggravated nature to Frost. Accordingly, defendant is not entitled to relief on this issue.

## B. CORPUS DELICTI

Defendant next argues that there was insufficient evidence establishing the *corpus delicti* of the crime and consequently that his confession should not have been admitted. Although defendant raised this issue at pretrial, the trial court denied that motion, and defendant did not object at trial to the admission of his confession on the ground that the *corpus delicti* had not been established. In fact, when the prosecutor moved for admission of defendant's recorded statement, defense counsel said he had "[n]o objection." Accordingly, this issue is waived, *People v Kowalski*, 489 Mich 488, 503-504; 803 NW2d 200 (2011), and "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (internal quotation marks and citation omitted).

Even if we were to consider defendant's argument, we find it without merit. Our review of the record leads us to conclude that at trial, the State produced sufficient proof of the *corpus delicti* beyond defendant's confession. Defendant admitted that he regularly abused Frost. See *People v Schumacher*, 276 Mich App 165, 181; 740 NW2d 534 (2007) (explaining that a defendant's admissions apart from a confession of guilt can be used to establish the *corpus delicti*). Additionally, Frost's body was discovered at the bottom of a pit under a carpet. And despite Shattuck's reliance on defendant's confession, she nonetheless testified to extensive physical trauma sustained by Frost, including a facial laceration, "bruising around the eyes," a perimortem fracture on one rib, abrasions on the torso and back, and "multiple areas of hemorrhage in the soft tissue of the scalp." The totality of the evidence in this case, including the reasonable inferences as previously stated can be drawn from that evidence, was sufficient to establish that Frost's death was caused by some criminal agency. *People v McMahan*, 451 Mich 543, 549; 548 NW2d 199 (1996).

## C. APPOINTMENT OF EXPERT

Defendant next argues that the trial court erred in denying his motion for appointment of an expert to provide a second opinion on the cause of the victim's death. We review a trial

court's decision on a request for appointment of an expert for an abuse of discretion. *People v Bergman*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 320975); slip op at 8. "An abuse of discretion occurs . . . when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MCL 775.15 permits trial courts to appoint expert witnesses for criminal defendants under certain circumstances. *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). For a defendant to be appointed an expert under MCL 775.15, he "must demonstrate a nexus between the facts of the case and the need for an expert." *Id.* at 617. Before trial, defendant moved "for funds for a second opinion of pathology and cause of death." Defendant criticized the conclusions of Shattuck's autopsy report and requested funds to have another pathologist examine the case. Defendant alleged in his motion that he was "communicating with" another doctor "to provide a second opinion." However, he provided no indication that any expert would likely benefit his defense.

In this case the trial court correctly focused on the need for defendant to demonstrate there was a nexus between the facts and the need for an expert. When defense counsel was unable to offer to the trial court a nexus between the facts and the need for an expert, the trial court properly concluded that an expert was not warranted. In the absence of an indication that expert testimony would likely benefit the defense, it was not error to deny the motion for appointment of an expert witness. *People v Jacobson*, 448 Mich 639, 641-642; 532 NW2d 838 (1995). Accordingly, we cannot find that the trial court abused its discretion and defendant is not entitled to relief on this issue.

## D. UNLAWFUL ENTRY

Finally, defendant argues in a Standard 4 brief that officers entered his house illegally after he and the victim had disappeared. He contends that the entry was not a proper "welfare check" as the officers claimed. While we note that defendant's theory is mere conjecture without record support, even if we were to find a violation of defendant's Fourth Amendment rights, the remedy for an unlawful search is exclusion of the evidence gleaned from that search. *People v Barbarich*, 291 Mich App 468, 473; 807 NW2d 56 (2011). See also *People v Chambers*, 195 Mich App 118, 120; 489 NW2d 168 (1992) ("[S]uppression of evidence, not dismissal of the charge, is the proper remedy for an illegal search or seizure.") In this case, defendant fails to identify any evidence that was offered at trial from the second entry into his house. Undeniably, the crucial evidence in this case was Frost's body and defendant's confession. Accordingly, defendant is not entitled to relief.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello

-6-