# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHALUN LATOI SANDERS,

        Defendant-Appellant.

UNPUBLISHED
November 22, 2016

No. 328067
Ingham Circuit Court
LC No. 14-000361-FC

Before: BOONSTRA, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Defendant was convicted of armed robbery, MCL 750.529, under an aiding and abetting theory following a jury trial. She was sentenced to 42 to 120 months in prison and appeals as of right. We affirm defendant's conviction, but vacate her sentence and remand for resentencing.

## I. FACTUAL BACKGROUND

On March 15, 2014, Rodney Tipton bought 20 winning lottery tickets, each worth $416. That afternoon, Karim Karana, who was working at the 1910 Meat Market in Lansing, cashed out 10 of the winning tickets for Tipton and paid him $4,160 but did not have funds to cash out the other 10 tickets. This transaction was recorded on videotape ("the market video"), which showed that Karana openly counted out the money on the market counter while defendant and Billie Lackey were standing behind Tipton. Detective Andrew Hogan narrated the market video while it played for the jury at trial and described how Lackey "lean[ed] forward on his tiptoes looking up and over at the money being counted out" while defendant stood directly beside Lackey with "what appeared to be a pretty clear view" of where the money was being laid out. Tipton testified that he gave some money to people in the store, put the balance in his left pocket and decided to go to Von's Market, which was nearby, apparently to attempt to cash out his remaining ten lottery tickets. Cecil Thornton, Tipton's cousin, who was at the deli counter getting some meat, testified that before Tipton went to Von's, Tipton told him that he was going "across the parking lot to another store."

Tipton testified that he then walked over to Von's. Cecil testified that he and his brother, Clemie Thornton, drove over and that Clemie went inside with Tipton while Cecil stayed in the back seat of the car. Cecil testified that he then noticed a white Suburban with black trim pull into the parking lot and saw a man jump out of the passenger side, run up to Von's, open the door, look inside, come back out, "motioning, like, here he come[s]," and then jump back in the

-1-

Suburban. Cecil testified that he then saw Tipton come out of Von's and saw a different man, who he would later identify as Lackey, exit the driver's side of the Suburban. Tipton testified that Lackey ran up behind him with a gun and say something. Tipton testified that Lackey "stood in front of" him with the weapon "facing the ground," and reached into Tipton's pocket with his left hand, taking approximately $4,000.00, before running back to the Suburban and getting in on the left rear of the vehicle. Tipton and Cecil both testified that the Suburban was being driven by a black female with long hair. Tipton also stated that after the robbery, the Suburban then "backed up all the way up to Pleasant Grove so you couldn't see the plate." Investigators later determined that the Suburban backed up 163 feet and 9 inches before turning.

After the robbery, Tipton called 911. Cecil testified that he then gave the police a description of the vehicle, the driver, and the robber. The police officer who interviewed Tipton testified that after showing Tipton the market video Tipton identified the woman and the man behind him in line at the Meat Market as the driver and robber. Within 10 minutes of dispatch putting out a description of the suspects and the Suburban, the vehicle was spotted. Defendant was driving. Tipton and Cecil were taken to the scene of the traffic stop, and the officer who drove them there testified that they both identified defendant and Lackey as those involved in the robbery, an identification that Tipton repeated in his own testimony. Also, Cecil testified that the vehicle at the traffic stop was the same vehicle involved in the robbery.

Officer Jeremiah Wonnacott testified that, during the traffic stop, he interviewed defendant and that she admitted to being at the market with Lackey, acknowledged being in line behind the person who had cashed out the lottery tickets, and admitted that she knew that the person had a large amount of money on him. Wonnacott testified that defendant did not indicate that she had been threatened by Lackey.

## II. ANALYSIS

### A. SUFFICIENCY OF EVIDENCE

Defendant argues that the jury had insufficient evidence to convict. We disagree.[1]

Claims of insufficient evidence "focus[] on whether the evidence, taken as a whole, justifies submitting the case to the trier of fact." *People v Clark*, 172 Mich App 1, 6; 432 NW2d 173 (1988). Due process requires such evidence to sustain a conviction. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended on other grounds 441 Mich 1201 (1992). We review "the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). Prosecutors must prove three elements to secure a conviction on an aiding and abetting theory:

---

[1] We review de novo sufficiency of the evidence claims. *People v Osby*, 291 Mich App 412, 415; 804 NW2d 903 (2011).

(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Carines*, 460 Mich 750, 768; 597 NW2d 130 (1999).]

In the present case, defendant was charged with armed robbery. "The essential elements of an armed robbery are (1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute." *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993). An assault requires "commi[ssion of] an unlawful act which placed another in reasonable apprehension of receiving an immediate battery." *People v McConnell*, 124 Mich App 672, 678; 335 NW2d 226 (1983). MCL 750.529, the statute governing armed robbery, explains that the defendant may be (a) armed with "a dangerous weapon," (b) armed with "an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon," or (c) "represent . . . that he or she is in possession of a dangerous weapon."

"Armed robbery is a specific intent crime." *People v Flowers*, 186 Mich App 652, 654; 465 NW2d 43 (1990). "An aider and abettor must have the same criminal intent as the principal." *Robinson*, 475 Mich at 28. However, "the intent of the aider and abettor is satisfied by proof that he knew the principal's intent when he gave the aid or assistance." *People v McCray*, 210 Mich App 9, 14; 533 NW2d 359 (1995). Intent "may be inferred from all the facts and circumstances," including the defendant's actions. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). Because proving a defendant's state of mind is difficult, "minimal" circumstantial evidence may prove intent. *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). "Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 460 Mich at 757-758. Viewing the evidence in the light most favorable to the prosecution, a rational jury could reliably find all elements of an armed robbery under an aiding and abetting theory.

First, there is sufficient evidence that Lackey, the principal, committed an assault against Tipton. Tipton testified that Lackey ran up from behind with a gun in his hand, and said something startling, which frightened him, and he testified that he thought that Lackey "would have shot" him had he fought back or refused to give up the money. This element was also fully supported by the testimony of Cecil and Hogan both of whom testified consistently with Tipton's description of events.

Second, there is sufficient evidence that Lackey committed a felonious taking of money from Tipton's person. Tipton testified that Lackey took approximately $4,000.00 out of his pocket, and Cecil testified that he watched this occur. A video-recording showed Lackey "reaching in and pulling things out" of Tipton's pockets.

Third, testimony shows that Lackey committed the robbery while armed with a dangerous weapon as described in MCL 750.529. Tipton and Cecil testified that Lackey was armed with a gun while he committed the robbery, and both witnesses described the gun

consistently and in detail. A gun was never recovered or depicted on the video-recording. But even if Lackey did not use a gun, the video-recording as narrated by Hogan showed Lackey raise his hand in a manner that would be consistent with the possession of a weapon and would have allowed the jury to infer that Lackey "represent[ed] . . . that he . . . [wa]s in possession of a dangerous weapon." MCL 750.529.

Fourth, evidence showed that defendant performed acts or gave encouragement that assisted the commission of an armed robbery. Evidence was presented that defendant drove the Suburban just before the armed robbery, waited in the parking lot as Lackey committed the armed robbery, and then drove Lackey away from the scene. Defendant stipulated that she was identified as the driver of the Suburban ultimately pulled over.

On appeal, defendant argues that her actions of driving away from the scene of the robbery make her at most guilty of accessory after the fact. However, the evidence established that defendant committed acts of assistance *after* she became aware that Tipton was carrying a large sum of cash and that Lackey intended to rob him. A video-recording showed her watching Karana count out $4,160 in cash and give it to Tipton. She stood directly beside Lackey with what appeared to be a pretty clear view of the countertop where the money was being laid out. Then, the video showed Lackey view a conversation between Tipton and Cecil, during which, according to Cecil, Tipton indicated that he was going to another store to cash out additional lottery tickets. Finally, as the driver of the vehicle, defendant witnessed the events described by Cecil, including the fact that one of her passengers got out of the car to watch Tipton and to announce to Lackey when Tipton was leaving Von's. Based on this evidence, a rational jury could have inferred that defendant knew that Lackey specifically intended to commit an armed robbery prior to its commission and when she assisted him. *Carines*, 460 Mich at 757. Accordingly, the evidence was sufficient and there was no due process violation.

## B. SENTENCING

The trial court sentenced defendant to 42 to 120 months in prison. The minimum sentence was within the guidelines sentencing range of 42 to 70 months based on a total prior record variable (PRV) score of zero and a total offense variable (OV) score of 45: 15 points for OV 1, 5 points for OV 2, 10 points for OV 4, and 15 points for OV 10. While defendant frames this issue as a *Lockridge*[2] issue and failed to preserve a claim based on OV scoring error, the prosecution concedes that the trial court incorrectly scored OV 4, requiring resentencing. Therefore, we address defendant's claim of sentencing error as a *Francisco*[3] error and not as a *Lockridge* error and remand to the trial court for resentencing.[4] However, on remand, as the

---

[2] *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

[3] *People v Francisco*, 474 Mich 82, 84, 88; 711 NW2d 44 (2006).

[4] While unpreserved claims are reviewed for plain error affecting a substantial right, *People v Schumacher*, 276 Mich App 165, 177; 740 NW2d 534 (2007), a prosecutor's admission of a scoring error constitutes "a plain error affecting the defendant's substantial rights." *People v Lathrop*, 480 Mich 1036, 1036; 743 NW2d 565 (2008)

-4-

parties agree, the trial court should utilize the now advisory sentencing guidelines, as described in *Lockridge*.

A defendant is entitled to be sentenced by a trial court on the basis of accurate information. *People v Francisco*, 474 Mich 82, 89-91; 711 NW2d 44 (2006). Scoring errors entitle defendants to resentencing. *Id*. A "sentence is invalid if it is based on inaccurate information." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997). As noted above, the prosecutor concedes that OV 4 was scored improperly. OV 4 addresses "psychological injury to a victim." MCL 777.34(1). A trial court may assign 10 points under OV 4, if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). There was no indication in the record that Tipton suffered such an injury. Subtracting the 10 points scored under OV 4 from defendant's total OV score reduces defendant's total OV score from 45 points to 35 points resulting in her being a level II offender instead of a level III offender, which reduces her guideline minimum sentence range from 42 to 70 months down to 27 to 45 months. MCL 777.62. Depriving her of her liberty interest, for any improper time period constitutes plain error requiring resentencing. *People v Lathrop*, 480 Mich 1036, 1036-1037; 743 NW2d 565 (2008) (resentencing when the prosecutor admitted to a PRV scoring error).

Because the trial court erred in its OV scoring and because this error affected the statutory sentencing guidelines range, we remand to the trial court for resentencing. Additionally, because we find that the trial court's scoring errors require resentencing, we need not reach defendant's *Lockridge* challenge other than to remind the trial court the sentencing guidelines are now advisory.

## III. CONCLUSION

We affirm defendant's conviction but vacate her sentence and remand for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola