# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DESEANTA RODERICK THOMPKINS,

        Defendant-Appellant.

UNPUBLISHED
August 9, 2016

No. 326028
Wayne Circuit Court
LC No. 14-006448-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LEANDER STACEY THOMPKINS,

        Defendant-Appellant.

No. 326094
Wayne Circuit Court
LC No. 14-006424-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIAM ROY LEE, JR.,

        Defendant-Appellant.

No. 326095
Wayne Circuit Court
LC No. 14-006441-FC

Before: K. F. KELLY, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

-1-

In this consolidated appeal, defendant Deseanta Roderick Thompkins (Deseanta) appeals as of right his jury trial conviction for first-degree premeditated murder, MCL 750.316(1)(a), for which he received a life sentence.[1] Defendant Leander Stacey Thompkins (Leander) appeals as of right his jury trial conviction for second-degree murder, MCL 750.317, for which he was sentenced to 25 to 45 years' imprisonment. Defendant William Roy Lee, Jr. (Lee) appeals as of right his jury trial conviction for first-degree premeditated murder for which he received a life sentence. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

The twenty-five year old victim in this case, Jonathon Michael Stokes (a/k/a "Slim"), was found shot to death near a bus stop in the City of Detroit on July 31, 2013. The victim's identification was found next to his body. His front pockets were turned inside out as though someone had rummaged through his pockets and his Cartier glasses were nowhere to be found. The victim had been shot five times – four times in the legs and once in his head; all shots were from behind. The four bullets recovered from the victim's body revealed that all bullets came from the same barrel of a .38 caliber weapon.

Defendants were charged in the victim's murder and were tried together. Deseanta and Leander are cousins. Deseanta was also known as "D," "De" or "Day." Leander was sometimes referred to as "Le Le." Although tried together, there were two juries – one for Leander and another for Deseanta and Lee. At trial, it was the prosecutor's theory that defendants were upset with the victim and thought he was a "snitch." In contrast, defendants argued that this was a case of mistaken identity and that the shooter was actually Leander's cousin, Dejuan Griffin (Griffin), whose street name was similar to Deseanta's – "Da Da."

Jeffrey Pursey testified that on the night of the murder he was on his way to a liquor store on Seven Mile between Grand River and Telegraph to meet a friend and go to the casino. Pursey was unable to pull into the driveway of the liquor store because there were three individuals in the way. One individual had on dark pants and a black hoody. Another had on dark pants and a white shirt. Pursey was not entirely sure what the third individual was wearing, but knew he was wearing dark clothing. At trial, Pursey identified Lee as the one in the white t-shirt and Deseanta as the one in the hoody. Pursey testified that Lee actually waved Pursey into the parking lot. Pursey's friend arrived within a couple of minutes. Pursey put his phone and charger on his friend's front seat and was planning to go into the liquor store to grab a drink when he heard five gunshots.

Pursey went up to Seven Mile and saw the same three individuals running toward him. Pursey grabbed his phone from his friend's car and dialed 911 while driving to the area. He saw a body lying on the ground. Pursey called 911 and later gave Detective Detrick Mott a written statement and identified Lee from a photo array as the individual who waved him into the

---

[1] Deseanta was also convicted and sentenced for first-degree felony murder, MCl 750.316(1)(b), but the sentence was vacated.

parking lot and the one he later saw running towards him. Pursey identified Deseanta from another array as the individual in the black hoody.

All three defendants attacked the credibility of Pursey's testimony because the victim's family had given Pursey $12,000 before trial as a reward for his cooperation. The victim's mother, Dorothy Strong-Stokes, testified that she and her husband had originally put up a $27,500 reward with Crime Stoppers, hoping to apprehend their son's killers. Although Pursey provided critical information in the case and had testified at several preliminary examinations, Crime Stoppers informed Strong-Stokes that Pursey did not qualify to receive the reward because he had not made a tip directly to them. Crime Stoppers told Strong-Stokes that if she wanted Pursey to have the money, she would have to do it herself. They returned the Stokes' money. Strong-Stokes testified that she felt $12,000 was a fair reward. She did not intend the payment as a bribe for Pursey's testimony. Pursey denied that the $12,000 influenced his testimony at a later preliminary examination or at trial. In fact, when Pursey gave his statement to police and positively identified Lee and Deseanta, he was unaware that there was a reward through Crime Stoppers.

The only witness at the bus stop the night of the murder was Castro Pettway. Pettway saw three individuals approaching from the east. One had on a black hoody and another was wearing a white t-shirt. They stopped about 40 feet before the bus stop and were talking amongst themselves. They continued to approach the bus stop when the individual wearing the hoody mentioned something to the victim about a bus and pulled out a gun. Pettway heard and saw the first shot fired and then ran. He heard three or four more shots. Pettway waited approximately five minutes and then went back to retrieve his bag. Pettway could not identify the shooters at trial.

Walter Williams was doing some maintenance in the area where the murder occurred. He heard four gunshots in the distance. From a window, Williams could see that there was a man on the ground and four others around him. Three of the men were kneeling down and appeared to be going through the man's pockets. Like Pettway, Williams could not identify any of the individuals at trial.

Another key witness for the prosecution was Diamond Ruff (Ruff), who testified that she was with all three defendants the night of the shooting. Ruff testified that she had known the victim for seven years and he was once her best friend. She knew Lee as "Will," Deseanta as "De" (the letter), and Leander as "Lee" or "Lee Lee." Ruff testified that both the victim and defendants sold marijuana.

On the day of the murder, Ruff had been drinking Cognac since the morning. She also had been smoking "kush," which she described as a more "exotic" and "stronger" form of weed. Ruff was riding around with defendants in Lee's Yukon or Suburban. She probably "dozed off" in the car from smoking and drinking. At approximately 10:00 p.m., Deseanta went to the store to buy more liquor and blunts. Lee received a phone call and told the caller, "be there in a minute." All three defendants then got out of the car. Defendants returned after approximately 10 minutes. They seemed "hyped up" so Ruff asked them what was happening. Leander said, "I got that n*****, I got that n*****." In her statement to police, Ruff said that Defendant Leander

Thompkins said, "I got that n*****, I got that n***** . . .I had to pop a n***** a couple of times. That n***** got handled."

Ruff did not know what Leander was talking about. Defendants dropped her off at a friend's house. While at her friend's house, Ruff received a call that the victim was dead. Ruff put together a candlelight vigil, which defendants attended. Although Ruff could have contacted the victim's parents with information about the murder, she was scared to do so. Ruff eventually gave Mott a statement and identified defendants from photo arrays.

As part of his investigation, Mott went to the liquor store to see if there was useable surveillance footage. Because the footage ran a ten hour loop, Mott had to capture the video on his phone's camera. Therefore, as the parties acknowledged, the footage was not good. The jury watched the surveillance video from inside and outside the store.

Mott testified that Lee gave police a statement on November 22, 2013. The video was played for the Deseanta/Lee jury, only. In the statement, Lee told Mott that Leander was there at the time of the shooting, but blamed the shooting on "Day" or "Day Day" (Griffin), who shot the victim because "he was snitching or being an informant in the neighborhood."

Mott testified that Leander also made an informal statement to police on November 22, 2013 at which time Leander indicated he was with his cousin at the time of the shooting. Mott spoke with Leander a second time on November 25, 2013. Leander denied that he was present during the murder, but implicated his cousin, Griffin, saying "that's the kind of person he is." Leander demonstrated for Mott how Griffin shot the victim. Griffin had asked Dwayne Haywood[2] to borrow a weapon, but Leander did not think Griffin was going to kill the victim. Leander vehemently denied being part of the crime. He was released from custody shortly after making his statement, but was later re-arrested after Mott had a chance to interview Ruff and learned that Leander admitted to shooting the victim.

In front of the Deseanta/Lee jury, only, Hasheem Beamon testified that, on the night of the murder, he was with defendants, as well as Haywood, "Da Da" (Griffin) and "50." At some point, Leander, "Da Da" and "50" left; neither Lee nor Deseanta went with them. Shortly after they left, Beamon heard gunshots. The men returned and Leander said that they shot someone named "Slim." Leander said he shot first and then "Da Da" took the gun and "finished him off." They told Beamon that "Slim" was a snitch: "They told me they had to kill a n*****." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta and Lee "didn't have s*** to do with this."[3]

Brandy Harris testified that the victim was her cousin. She was planning to pick him up the night of the murder. In a phone call earlier that day, the victim reported that he had just had a fight with someone who had called him a snitch. Harris remembered that one of the houses that

---

[2] Haywood was deceased at the time of trial.

[3] Beamon later shot and killed Haywood in what was described as an accidental shooting.

the victim frequented had been raided. Later, Harris saw that a Caucasian man had the victim's phone and when Harris asked the man where the victim was, he told her that the victim had gone to the gas station. After learning that the victim had been shot, Harris went to retrieve the victim's phone from the Caucasian man, who threw it at her. Mott acknowledged that a white man on Wormer, Patrick Boggs, was later arrested on unrelated charges. Mott did not believe Boggs was connected to the homicide.

In front of the Deseanta/Lee jury, only, Shenequia Carr (Peaches) testified that she was with Deseanta at her house at the time of the murder. They heard shots and police sirens and walked to where the shooting occurred. In a surveillance photo, Carr identified the man in a hoody as "Da Da," whom she also saw that night. Carr testified she saw Lee with Haywood a couple of doors down. She did not see Ruff with any of the defendants.

Although Leander, Haywood's widow (Roslyn Haywood), Beamon, and Carr, accused "Da Da" (Griffin) of being responsible for the crime, attempts at locating him were unsuccessful. Mott admitted that he initially associated "Da Da" with Deseanta.

Defendants were convicted and sentenced as outlined above.

## II. DESEANTA'S APPEAL (326028)

### A. DISCOVERY VIOLATIONS

Deseanta argues that he was deprived of due process and a fair trial when the trial court failed to grant his motion for mistrial, which was based on the prosecutor's various *Brady*[4] violations. We disagree.

Defendant's claim that he was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 US at 87. In order to establish a *Brady* violation, the test is whether "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id.* at 150. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 150, quoting *United States v Bagley*, 473 US 667, 682; 105 S Ct. 3375, 87 L Ed 2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Chenault*, 495 Mich at 150. "The question is not whether the defendant would more likely than not have received a different verdict with the

---

[4] *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

evidence, but whether in its absence he received a fair trial.. . .” *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

Deseanta first argues that the prosecutor failed to provide him with Leander's recorded police interview in which Leander inculpated Griffin and exculpated Deseanta. However, as will be discussed in further detail later in this opinion, the evidence was inadmissible in Deseanta's case because Leander's statement was not against Leander's penal interest and lacked sufficient corroborating evidence of trustworthiness. Because the evidence was inadmissible, it cannot be considered material.

Deseanta next argues that the prosecutor suppressed evidence that Pursey had received $12,000 from the victim's family as a "reward." Mott testified that he learned Pursey had received the money following the final preliminary hearing in July 2014. Mott should have brought that information to the prosecutor's attention prior to trial, which started several months later in December 2014. Such evidence called into question Pursey's credibility. Still, Deseanta was not deprived of a fair trial. Evidence relating to the $12,000 played a significant role at trial. All of the defendants vigorously attacked Pursey's credibility and the jury was made fully aware that he had been paid prior to trial.

Finally, Deseanta complains that defense counsel was not made aware that Mott saw the defendants pulling down Crime Stopper flyers because such information was not included in Mott's reports. However, as the prosecutor points out, Deseanta fails to indicate how this evidence was favorable to him. In fact, evidence that Deseanta was seen taking down Crime Stoppers posters seems rather incriminating. To the extent Deseanta argues that the evidence (or lack thereof) was relevant to Mott's overall credibility, defense counsel pursued Mott's failure to include the information in his reports. The jury was, therefore, apprised of Mott's alleged lack of credibility. There is simply no indication that the "evidence" was material to Deseanta or deprived him of a fair trial.

## B. RIGHT TO PRESENT A DEFENSE

Deseanta next argues that he was deprived of the right to present a defense when the trial court refused to allow Deseanta to introduce Leander's statement to police. We disagree.

"This Court . . .reviews de novo the constitutional question whether a defendant was denied [his] constitutional right to present a defense." *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). "This Court reviews preserved evidentiary issues for an abuse of discretion. A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007) (internal footnote omitted).

"A criminal defendant has a right to present a defense under our state and federal constitutions," which necessarily includes evidence that "might influence the determination of guilt." *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006). Deseanta argues that his right to present a defense was impacted when the trial court prevented him from presenting Leander's statement to police as evidence at trial. In Leander's November 25, 2013 statement,

-6-

Leander implicated his cousin Griffin, indicating that Griffin had an argument with the victim, borrowed a gun, and boasted of shooting the victim.

Leander's statement to police was hearsay. " 'Hearsay' is a statement, other than the one made by the defendant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(d). Hearsay is not admissible except as provided by the rules of evidence. A statement against penal interest is only admissible if the declarant is unavailable.[5] MRE 804(b)(3) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The trial court correctly concluded that Leander's statement to police did not constitute a statement against his own penal interest; instead, Leander asserted that he was merely present when some of the discussions took place and otherwise vehemently denied any wrongdoing. Leander's statement did not, on its face, facially expose Leander to criminal liability.

In any event, even if Leander's statement could be construed as against his penal interest, because the statement was offered to exculpate Deseanta from criminal liability, an additional hurdle had to be cleared. As the proponent of the evidence, Deseanta had to show that corroborating circumstances clearly indicated the trustworthiness of Leander's statement. MRE 804(b)(3). In *People v Poole*, 444 Mich 151, 163; 506 NW2d 505 (1993), overruled in part by *People v Taylor*, 482 Mich 368, 378; 759 NW2d 361 (2008), the Supreme Court discussed "[t]he indicia of reliability necessary to establish that a hearsay statement has particularized guarantees of trustworthiness" and concluded:

> In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability to allow it to be admitted as substantive evidence against the other person, courts must evaluate the circumstances surrounding the making of the statement as well as its content.

> The presence of the following factors would favor admission of such a statement: whether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates—that is, to someone to whom the declarant would likely speak the truth, and (4) uttered

---

[5] There is no question that Leander was unavailable, having invoked his constitutional right not to testify.

spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.

On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth. [*Id*. at 165.]

Granted, and as discussed in further detail below, *Poole* was subsequently partially overruled in *Taylor* to the extent *Poole* found that the Confrontation Clause had any application to nontestimonial statements. And Leander's statement was not being used as substantive evidence against another person. But the factors *Poole* discusses when looking to whether a statement has sufficient indicia of trustworthiness is still helpful. Here, Leander's statement was made to law enforcement during an interrogation at which time Leander minimized his role and shifted blame to Griffin. Leander had a strong motivation to lie or distort the truth and his statement was primarily self-serving. Under those circumstances, it cannot be said that Leander's statement to police had sufficient corroborating circumstances indicating the trustworthiness of his statement. The trial court, therefore, did not abuse its discretion in refusing to permit Deseanta to present the statement to the jury.

Although the trial court refused to permit Deseanta to present Leander's statement to the jury, Deseanta was not denied his right to present a defense and, in fact, placed blame for the shooting squarely on Leander and Griffin. At trial, Beamon testified that Leander and Griffin admitted to shooting "Slim" for being a snitch, with Leander firing the first shot and Griffin "finishing him off." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta "didn't have s*** to do with this." Additionally, in his statement to police, Lee blamed the shooting on Griffin. Deseanta was able to present the jury with his theory that he was mistaken for Griffin based on their similar street names. Defendant was not denied his right to present a defense.

## C. LEANDER'S STATEMENT TO RUFF

Deseanta next argues that the trial court erred in admitting evidence of Leander's statement to Ruff because Leander's statement not only implicated himself, but also implicated Deseanta, who was allegedly with Leander at the time the statement was made. Deseanta's right to confrontation were violated because he was unable to cross-examine Leander, as set forth in *Bruton v United States*, 391 US 123, 127–128; 88 S Ct 1620; 20 L Ed 2d 476 (1968). We disagree.

"Constitutional questions, such as those concerning the right to confront witnesses at trial, are reviewed de novo." *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

A defendant's Sixth Amendment right to confront the witnesses against him is violated if the trial court allows the admission of a non-testifying codefendant's confession implicating the defendant at a joint trial. *Bruton*, 391 US at 127–128; *Pipes*, 475 Mich at 269. Additionally, out-of-court testimonial statements by nontestifying witnesses are not admissible under the

Confrontation Clause unless the witness is unavailable and the defendant had an opportunity to cross-examine the witness. *Crawford v Washington*, 541 US 36, 51–52; 124 S Ct 1354; 156 L Ed 2d 177 (2004); *People v Nunley*, 491 Mich 686, 698; 821 NW2d 642 (2012).

However, *Crawford* has no application in this case because Leander's statement was non-testimonial in nature. "[T]he right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011). Our United States Supreme Court has explained:

> The text of the Confrontation Clause . . .applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. [*Crawford*, 541 US at 51.][6]

Nor does *Bruton* have any application to this case because, not only was Leander's statement non-testimonial, but Leander did not specifically implicate Deseanta or Lee or attempt to shift the blame for the shooting onto his codefendants. When nontestimonial hearsay is at issue, the states are afforded the opportunity to create their own rules of admissibility. *Crawford*, 541 US at 68. Thus, the relevant inquiry is whether Leander's statement to Ruff qualifies under the rules of evidence. The trial court found Leander's statement admissible both as an excited utterance and as a statement against penal interest.

### D. RUFF'S IDENTIFICATION OF DESEANTA ON SURVEILLANCE VIDEO

Finally, Deseanta argues that the trial court also erred in allowing Ruff to identify that it was Deseanta with others in a video. We disagree.

Ruff testified that she had the opportunity to observe surveillance videos. The prosecutor played the video and Ruff identified the liquor store and Lee's vehicle in the parking lot. She also identified Deseanta as the man inside the store, covering his face.

The identification testimony in this case constituted lay opinion testimony. *Fomby*, 300 Mich App at 50. MRE 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding

---

[6] Testimonial statements minimally include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . .police interrogations." *Id.* at 68.

of the witness' testimony or the determination of a fact in issue." In *Fomby*, this Court cited federal case law that "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo was a determination properly left to the jury." *Fomby,* 300 Mich App at 52. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980). In *Fomby*, the Court concluded that there was no reason to believe that the witness who offered the identifying testimony was "more likely to identify correctly the person than is the jury" and, in so doing *Fomby* Court acknowledged that there are times when specific identification testimony is appropriate. *Id.* (internal quotation marks omitted).

Here, Ruff testified that she was well acquainted with all of the defendants and had known them for several months before the night of the murder. She had spent the evening with them and was present when they were at the liquor store. Because the video was on a loop and was in jeopardy of being taped over, Mott had to capture the images on his phone. By all accounts, the footage was grainy and shaky. Ruff was, therefore, more likely to correctly identify the individual in the surveillance video than the jury and did not invade the province of the jury.

### III. LEANDER'S APPEAL (326094)

Leander argues that there was insufficient evidence to support his conviction. We disagree.

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.* at 428.

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-64; 579 NW2d 868 (1998). At issue is whether the jury could have found that these essential elements were proven beyond a reasonable doubt. *People v Russell*, 297 Mich App 707, 721; 825 NW2d 623 (2012).[7]

---

[7] Leander seems to imply that he was found guilty under the theory of aiding and abetting. The aiding and abetting statute, MCL 767.39, provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

There was sufficient evidence to convict Leander of second-degree murder. Ruff testified that Defendant Leander Thompkins said, "I got that n*****, I got that n***** . . .I had to pop a n***** a couple of times. That n***** got handled." And, as the prosecution points out, Leander's statement to police placed him at the shooting. Although there were inconsistencies, the jury was at liberty to accept or reject any of the testimony in its role as the trier of fact. *Russell*, 297 Mich App at 721. It was permissible, therefore, for the jury to use Leander's statement to the police to place him at the shooting and reject the remainder of the self-serving statement while accepting Ruff's testimony that Leander admitted to shooting the victim. Additionally, even though Pettway saw Deseanta with the gun, it is possible that Deseanta fired the first shot and then handed the gun to Leander. A rational jury could have inferred from the circumstances of the case that defendant caused or aided in the victim's death.

## IV. LEE'S APPEAL (326095)

Lee argues that the trial court erred in concluding that Leander's statement to Ruff was admissible as an excited utterance under MRE 803(2) or as a statement against penal interest under MRE 804(b)(3). We disagree.

MRE 803(2) provides that, regardless of whether a declarant is available, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. "The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998) (internal quotation marks omitted). Therefore, when determining whether the declarant is still under the excitement caused by the event, the relevant inquiry is "whether the statement was made before there was

---

Therefore, in order to be convicted under an aiding and abetting theory, the prosecution must prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004). "In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 71. Whether and to what extent a defendant acts or gives encouragement "must be determined on a case-by-case basis." *Id.*

time to contrive and misrepresent, and whether it related to the circumstances of the startling occasion." *Id.* at 550-551, citing *People v Straight*, 430 Mich 418, 424, 424 NW2d 257 (1988). However, "it is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *Smith*, 456 Mich at 551. The key is whether the declarant "was still under the influence of an overwhelming emotional condition" at the time the statement was made. *Straight*, 430 Mich at 425.

The record reveals that Leander was still under the stress of the excitement when he made the statement to Ruff. Ruff testified that the defendants left after Lee received a telephone call and returned after approximately 10 minutes. She noticed that defendants seemed "hyped up" so Ruff asked them what was happening. Leander said, "I got that n*****, I got that n*****." In her statement to police, Ruff said that Defendant Leander Thompkins said, "I got that n*****, I got that n***** . . .I had to pop a n***** a couple of times. That n***** got handled." Not only was the statement contemporaneous with the shooting, but Leander was acting under the influence of the stress of the event, as demonstrated by Ruff's testimony that they all seemed "hyped up." The trial court did not abuse its discretion when it admitted the statement as an excited utterance.

In contrast to an excited utterance where the availability of the declarant is irrelevant, a statement against penal interest is only admissible if the declarant is unavailable.[8] MRE 804(b)(3) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

A reasonable person in Leander's position would not have admitted to having "to pop a n***** a couple of times" because such a statement exposed Leander to criminal liability. Because Leander's statement was not "offered to exculpate the accused" there is no need to determine whether "corroborating circumstances clearly indicate the trustworthiness of the statement" under the rule.

To the extent Lee argues that the statement violated his right to confrontation, the Michigan Supreme Court has determined that "the holding in *Poole*, that a codefendant's nontestimonial statement is governed by *both* MRE 804(b)(3) and the Confrontation Clause is no longer good law." *People v Taylor*, 482 Mich 368, 378; 759 NW2d 361 (2008). Once a

---

[8] There is no question that Leander was unavailable, having invoked his constitutional right not to testify.

determination is made that a declarant's statement is nontestimonial, i.e. "made informally to an acquaintance, not during a police interrogation or other formal proceeding . . .or under circumstances indicating that their 'primary purpose' was to 'establish or prove past events potentially relevant to later criminal prosecution,'" the admissibility of the statement is ruled solely by MRE 804(b)(3). *Taylor,* 482 Mich at 378. Leander's statement not being testimonial in nature, the right to confrontation was not violated and the trial court did not abuse its discretion in admitting Leander's statement as a statement against penal interest.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause