*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

OMAR DEMOND TAYLOR,

        Defendant-Appellant.

UNPUBLISHED
August 10, 2023

No. 360812
Kent Circuit Court
LC Nos. 19-008278-FH; 20-003651-FH

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Defendant, Omar Demond Taylor, appeals as of right his convictions in two separate cases that were tried together. In file number 19-008278-FH, a jury convicted defendant of (1) aggravated stalking, MCL 750.411i; and (2) unlawful posting of a message with aggravating circumstances, MCL 750.411s(2)(b). Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve concurrent sentences of 4 to 15 years in prison, with credit for 947 days served. In file number 20-003651-FH, a jury convicted defendant of (1) using a computer to commit a crime, MCL 752.797(3)(d); (2) aggravated stalking, MCL 750.411i; and (3) false report or threat of a bomb or explosive device, MCL 750.411a(3)(a). Defendant was sentenced as a fourth-offense habitual offender to serve concurrent sentences of 7 to 20 years, 4 to 15 years, and 3 to 15 years in prison respectively, with credit for 881 days served.

Defendant argues on appeal that there was insufficient evidence to prove that he was associated with the bomb threats in October 2019, there was insufficient evidence to sustain the aggravated stalking conviction, he was denied his constitutional right to a speedy trial, and the trial court incorrectly assessed 25 points for offense variable (OV) 13. For the reasons set forth in this

opinion, we affirm defendant's convictions and sentences, but remand for the ministerial task of amending the judgment of sentence to correct the number of days of credit.[1]  See MCR 6.435(A).

## I.  BACKGROUND

During the events of this case, defendant was married to the victim, who was employed as a physician's assistant at Natural Health Improvement Center (NHIC).  The victim and defendant were married for 14 years, and they have two children together, ages 14 and 11.  The victim maintained that she was subject to physical abuse during the marriage:

> There was a lot of physical abuse.  There were a lot of episodes where I would be locked in a room or held in a room and not allowed to leave.  There were times where, if there was a disagreement I would be held down or if I tried to run away, I wasn't allowed to leave the house.  There were times where when I would finally get away (inaudible due to Zoom connection) the house, he would drag me back up the driveway and neighbors would call the cops.  [Tr III, 87.]

> \* \* \*

> There were multiple cameras throughout our house.  One was directly in the living room.  And it basically caught anything that was done in the living room.  There was one in the kitchen.  And he (inaudible due to Zoom connection) attached to his account and he would monitor everything that went on around the house, anybody that came or went from the house.

The victim started "strongly considering" divorce in May 2019 or June 2019.  In July 2019, the victim obtained a personal protection order (PPO) against defendant.  Although the victim hired a company to serve defendant with the PPO, it was unsuccessful "because [defendant] wouldn't answer the door at the house."  The victim was living with a coworker at this time, while defendant was still living in the marital residence.  When asked how defendant responded to hearing that the victim wanted a divorce, the victim explained:

> [Defendant] told me I wasn't going to and that he wasn't going to allow it. And he started being more aggressive and making comments and standing behind me and talking about (inaudible due to Zoom connection) was for him to snap my neck.  Or for him to hurt the base of my—my skull and making comments that made me extremely uncomfortable and scared that he was going to hurt me.  And he made multiple comments before that he would hurt me or he would hurt the children to hurt me.

---

[1] The lower court record indicates that defendant's jail credit in case 20-003651-FH was miscalculated—defendant was granted 881 days of credit, but he should have only been granted 859 days of credit.

-2-

This case arises out of four separate incidents: (1) on July 24, 2019, defendant caused a disturbance at NHIC and sent a concerning Snapchat; (2) on July 25, 2019, an explicit photo of the victim and defendant was posted from defendant's social media accounts to NHIC's Facebook and Twitter pages; (3) on October 16, 2019, a bomb threat was made to NHIC via a text message sent to the victim; and (4) on October 18, 2019, another bomb threat was made to NHIC via a phone call to Ottawa County's central dispatch.

## A. JULY 24, 2019

On July 24, 2019, defendant was witnessed yelling in the foyer of NHIC. Officers from the Grandville Police Department (GPD) were dispatched to NHIC. Upon arriving at NHIC, the officers observed defendant "visibly agitated," "boisterous," and pacing in the parking lot. Defendant told one of the officers that he was looking for the victim. Defendant went into the foyer of the building calling for the victim. The officers were able to persuade defendant to step out of the building, but he continued to yell for the victim and pace. Eventually, the officers were able to calm defendant. Defendant maintained that he was there to get a set of car keys from the victim. According to a GPD sergeant, defendant was angry because the victim was leaving him and they were getting a divorce.

The victim and the building manager told a GPD officer that they would like defendant removed from the property for trespass. The victim also informed the officer of the PPO that she had filed against defendant that was unable to be served on him. The officer went back outside and served defendant with the PPO. Defendant argued with the officers for 5 to 10 minutes before he took the PPO, got into a car, and drove away. Defendant was officially trespassed from NHIC's property, and the police officers left the scene. Later that afternoon, a GPD detective installed a voice-activated radio-dispatched alarm (VARDA) system at NHIC at the direction of GPD's deputy chief.[2]

Later that evening, an NHIC employee received a Snapchat message from defendant that said: "[C]ould you let [the victim] know to check her Snapchat please. Thank you." The NHIC employee responded, "[Y]up, no problem." Defendant replied, "[Y]ou lied to me." The NHIC employee asked, "[L]ied about what?" The NHIC employee then realized what had gone on earlier in the day, and she said: "I want no part of this especially after you came into our office the way you did today scaring everyone. I wish you well, but please don't contact me." Defendant responded:

> 4506, 1109, you all covered for her adulteress decisions. So the consequences of those actions fall on all of your heads. I wash my hands with you, and I will not be town, you guys make the news. I won't contact you anymore and I wish you well. Stay safe.

The NHIC employee that received the message and NHIC's practice manager were both too afraid to sleep at their homes for a couple of nights because the numbers that defendant referred

---

[2] The VARDA alarm system functions similarly to a panic button. It bypasses dispatch and directly notifies GPD over its radio system.

to in his message were their residential addresses. The victim also stayed at a hotel overnight out of fear for her safety. In response to the events on July 24, 2019, NHIC purchased surveillance cameras for the two targeted employees' homes. NHIC also purchased new door locks and posted security outside of the business.

## B. JULY 25, 2019

On July 25, 2019, an explicit photo was posted to NHIC's Facebook and Twitter pages—the photo depicted the victim "performing oral sex with [defendant]" and was captured from the security cameras in their house. NHIC's practice manager took the photo down from the business's social media page immediately after seeing it, which was approximately 3 to 5 minutes after it was posted. A GPD detective investigated the Facebook and Twitter accounts that posted the image and determined that they could be connected to defendant. Defendant told the detective that both Facebook accounts and his Wi-Fi security camera system had been hacked before the PPO was served on him. Defendant further informed the detective that he had already notified the victim of the hacking. But the GPD investigation did not show that the accounts or the security system had been hacked. The investigation revealed that the Facebook and Twitter accounts were both associated with the same IP[3] address as the couple's marital home and defendant's phone number that was provided to police.

## C. OCTOBER 16, 2019

On October 16, 2019, the victim received a threatening text message from a 770-area code phone number that stated:

> The Ultimately Vice Lord nation is coming for you, your family, the people you work with and their families. You dirty white cheating c**t. We have been tracking you since August and now your patters, your mother's routine, and how you think you meet secretly with M.T., LOL. Just because there is nothing you can do about, we have placed three bombs at your job. One near the oxygen tanks, other two you find out about soon enough.

The business owner was informed of the threat, after which the business owner instructed an employee to call the police and instructed the rest of the staff to begin their evacuation procedures. Patients had to be sent home, and some appointments needed to be canceled. GPD police officers investigated the threat. No bombs were found on the premises.

The victim did not recognize the numbers on the text message.[4] GPD's investigation revealed that the number was assigned to TextNow, which is an app that "allows a person to essentially for free, get a second or secondary phone number that would allow them to send and

---

[3] "IP address" stands for "Internet Protocol address." The Internet Protocol is a set of rules for communication over the internet, such as sending mail, streaming video, or connecting to a website.

[4] The text was sent to the victim from a 517-area code phone number, but the 517-area code phone number was not found to be related to this investigation.

receive text messages. And it can allow them to send and or make and receive phone calls as well." Twenty-six minutes before the bomb threat, the phone number was assigned to a username similar to the name of victim's divorce attorney, but the spelling of the e-mail address associated with the TextNow account did not match the spelling of the attorney's last name. And the attorney testified that he had no affiliation with the e-mail address.

Search warrants were served for the three e-mail addresses associated with the TextNow account. One of the e-mail accounts listed was not a real account, and another e-mail account listed was an old user e-mail for a previous TextNow assignment. However, the e-mail account that was similar to the name of the victim's divorce attorney was created on October 16, 2019, approximately one hour before the bomb threat was sent to the victim, and the account was deleted approximately five minutes after the bomb threat was sent.

The investigation determined that the IP address associated with the creation of the e-mail account belonged to a woman in Grand Rapids. The detective determined that the Internet connection was not "immediately available to somebody just passing by" that address. Unrelated police reports connected the woman and defendant, and defendant made approximately 2,000 calls from the Kent County Correctional Facility to the woman, approximately 500 of which were accepted. The woman admitted that she had known defendant for 6 to 10 years, that the defendant was staying at her home on October 16, 2019, and that she had given defendant her internet password. The woman maintained that defendant often used TextNow when he communicated with her by phone, and defendant had multiple phone numbers.

Additionally, on October 4, 2019, the Facebook account that had posted the explicit photo in July 2019 made a post that said, "Game on, hashtag TextNow," and on October 7, 2019, the same account made a post that said, "Hashtag TextNow" and provided a 616-area code phone number. The investigation revealed that the only IP address associated with the phone number from October 9, 2019 to October 17, 2019, was the same IP address belonging to the woman in Grand Rapids.

The user of the 616-area code phone number had "identified themselves as [defendant] several times" and shared pictures of defendant's two children in football uniforms. The 616-area code phone number had texted with the woman in Grand Rapids about a pizza order, and the texts indicated a romantic relationship. On the basis of this information, the GPD detective believed that the phone was being used by defendant. On October 15, 2019, the day before the bomb threat, the 616-area code phone number sent a message that said, "Just so you know [the victim] cut off communication with me." Moreover, on the date of the bomb threat, the IP address associated with the 616-area code phone number was the same IP address associated with the phone number that sent the bomb threat.

## D. OCTOBER 18, 2019

On October 18, 2019, GPD officers were again dispatched to NHIC for a false bomb threat. The threat on this day came in the form of a phone call to Ottawa County's central dispatch. The name that the caller used to make the threat was the name of the victim's deceased brother.

## E. VERDICTS AND SENTENCES

The jury found defendant guilty of (1) aggravated stalking on or about July 24, 2019 to July 25, 2019; (2) unlawful posting of a message with aggravating circumstances; (3) using a computer to commit a crime; (4) aggravated stalking on or about October 16, 2019; and (5) false report or threat of a bomb or explosive device.

In file number 19-008278-FH, the trial court sentenced defendant, as a fourth-offense habitual offender, to serve concurrent sentences of 4 to 15 years in prison, with credit for 947 days served. In file number 20-003651-FH, the trial court sentenced defendant, as a fourth-offense habitual offender, to serve concurrent prison sentences of (1) 7 to 20 years for using a computer to commit a crime, (2) 4 to 15 years for aggravated stalking, and (3) 3 to 15 years for false report or threat of a bomb or explosive device, with credit for 881 days served. Defendant now appeals as of right.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support his convictions of (1) using a computer to commit a crime, (2) aggravated stalking, and (3) false report or threat of a bomb or explosive device in file number 20-003651-FH. Defendant further argues that there was insufficient evidence to sustain his aggravated stalking conviction in file number 19-008278-FH. We disagree.

## A. STANDARD OF REVIEW

We review de novo a challenge to the sufficiency of the evidence. *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). We must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. *Id*. "Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). We "must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the . . . verdict." *Id.*

## B. JULY 2019 AGGRAVATED STALKING

Defendant was convicted of (1) aggravated stalking, MCL 750.411i; and (2) unlawful posting of a message with aggravating circumstances, MCL 750.411s(2)(b) concerning the events of July 24, 2019 and July 25, 2019. Defendant argues that the prosecution did not present sufficient evidence for aggravated stalking. We disagree.

Aggravated stalking consists of the crime of stalking and the presence of an aggravating circumstance. *People v Threatt*, 254 Mich App 504, 504; 657 NW2d 819 (2002). "Stalking" is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411i(1)(e). MCL 750.411i(1)(a) defines "course of conduct" as "a pattern of conduct composed of a series of 2 or more separate

noncontinuous acts evidencing a continuity of purpose." MCL 750.411i(d) defines "harassment" as

> [C]onduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

And MCL 750.411i(f) describes "unconsented contact" as

> [A]ny contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
>
> (*i*) Following or appearing within the sight of that individual.
>
> (*ii*) Approaching or confronting that individual in a public place or on private property.
>
> (*iii*) Appearing at that individual's workplace or residence.
>
> (*iv*) Entering onto or remaining on property owned, leased, or occupied by that individual.
>
> (*v*) Contacting that individual by telephone.
>
> (*vi*) Sending mail or electronic communications to that individual.
>
> (*vii*) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.

> MCL 750.411i(2) elevates stalking to aggravated stalking if:
>
> (a) At least 1 of the actions constituting the offense is in violation of a restraining order and the individual has received actual notice of that restraining order or at least 1 of the actions is in violation of an injunction or preliminary injunction.
>
> * * *
>
> (c) The course of conduct includes the making of 1 or more credible threats against the victim, a member of the victim's family, or another individual living in the same household as the victim. . . .

In this case, defendant appears to agree that the posting of the explicit image to NHIC's social media pages qualifies as one of the two required instances of unconsented contact with the victim. It is undisputed that defendant was served with the PPO on July 24, 2019, and the posting

was made on July 25, 2019. The posting violated the PPO and thus qualifies as one instance of stalking under MCL 750.411i(2)(a).

Defendant argues that there was insufficient evidence that his behavior at NHIC on July 24, 2019, and his threatening Snapchat message to the NHIC employee were instances of unconsented contact with the victim. We disagree. Defendant appeared at the victim's workplace on July 24, 2019 and did not leave until he was trespassed by the police. The victim stated that defendant's actions at NHIC on July 24, 2019, were "very traumatic" for her. Viewing the evidence in the light most favorable to the prosecutor, we find that the prosecutor presented sufficient evidence that could allow a rational trier of fact to find defendant guilty beyond a reasonable doubt of engaging in unconsented contact under MLC 750.411i(f)(*iii*). See *Lane*, 308 Mich App at 57.

Although this instance of unconsented contact would be enough to convict defendant of aggravated stalking, defendant's July 24, 2019 Snapchat message to the NHIC employee asking her to "let [the victim] know to check her Snapchat please" reflects that he attempted to contact the victim by Snapchat. This is an instance of unconsented contact under MCL 750.411i(f)(*v*) that was made in violation of the PPO that was served on defendant earlier that same day. Therefore, this contact would also qualify as an instance of aggravated stalking under MCL 750.411i(2)(a).

## C. OCTOBER 2019 BOMB THREATS

In this case, defendant argues that there was insufficient evidence to prove that he was associated with the bomb threats in October 2019 and thus the convictions arising out of the bomb threats should be reversed. In support of this argument, defendant relies on the fact that the bomb threats originated from the IP address belonging to the woman in Grand Rapids. He maintains that her network password was known by "many people" and that she could have "operate[d] independently of [defendant], whether through jealousy or otherwise." Defendant asserts that the prosecution did not offer sufficient evidence that defendant either made the threats or directed the woman from Grand Rapids to make the threats. We disagree.

Defendant was convicted of (1) using a computer to commit a crime, MCL 752.797(3)(d); (2) aggravated stalking, MCL 750.411i; and (3) false report or threat of a bomb or harmful device, MCL 750.411a(3)(a). MCL 752.796(1) states that "[a] person shall not use a computer program, computer, computer system, or computer network to commit, attempt to commit, conspire to commit, or solicit another person to commit a crime." MCL 752.797(3)(d) provides that "[a] person who violates [MCL 752.796] is guilty of a crime" "[i]f the underlying crime is a felony with a maximum term of imprisonment of 4 years or more but less than 10 years, the person is guilty of a felony punishable by imprisonment for not more than 7 years or a fine of not more than $5,000.00, or both." MCL 750.411a(3)(a) makes it a felony to falsely report, among other things, a violation of MCL 750.207. MCL 750.207(1) states as follows:

> A person shall not place an explosive substance in or near any real or personal property with the intent to frighten, terrorize, intimidate, threaten, harass, injure, or kill any person, or with the intent to damage or destroy any real or personal property without the permission of the property owner or, if the property is public property, without the permission of the governmental agency having authority over that property.

In this case, the threatening text message that was sent to the victim on October 16, 2019, stated:

> The Ultimately Vice Lord nation is coming for you, your family, the people you work with and their families. You dirty white cheating c**t. We have been tracking you since August and now your patters, your mother's routine, and how you think you meet secretly with M.T., LOL. Just because there is nothing you can do about, we have placed three bombs at your job. One near the oxygen tanks, other two you find out about soon enough.

Defendant's past behavior of harassment toward the victim, his belief that the victim had cheated on him during their marriage, and his knowledge of the victim's divorce attorney's name, "M.T.," align with the language in the text message. Additionally, defendant's threatening behavior at NHIC in July 2019, would allow a rational trier of fact to determine that this message was sent from defendant. Further, the GPD detective who investigated the matter set forth facts that led to his conclusion that defendant was using the 616-area code phone number that sent the text message. And, on the date of the October 15, 2019 bomb threat, the IP address associated with the 616-area code phone number was the same IP address associated with the phone number that sent the bomb threat. This information, at the very least, links defendant to the same apartment as the sender of the bomb threat on the day of the bomb threat.

The IP address was registered to a woman in Grand Rapids who testified that defendant was staying at her house and had her Internet password on the date of the first bomb threat. She denied that she had access to, or the password for, defendant's phone. She maintained that defendant often used TextNow when he communicated with her by phone, and he had multiple phone numbers. Taken together, this shows that defendant had the ability to send text messages, from multiple phone numbers, from the associated IP address on the date of the bomb threat.

Defendant argues that the woman in Grand Rapids sent the bomb threat out of jealousy. While this is a possibility, it was the jury's role to decide the witnesses' credibility and the weight accorded to the evidence; any conflict in the evidence must be resolved in favor of the verdict. See *Schumacher*, 276 Mich App at 167. The jury apparently determined, and a reasonable trier of fact could agree, that the woman in Grand Rapids did not take part in sending the bomb threats.

Finally, the caller who placed the second bomb threat used the name of the victim's deceased brother. Again, this threat was very personal, and in alignment with defendant's past behavior of harassment toward the victim and her workplace.

We find that the prosecution presented sufficient evidence to prove beyond a reasonable doubt that defendant falsely reported two bomb threats in October 2019. The bomb threats were sent from a phone and comprised of two instances of willful, separate, and noncontinuous acts of unconsented contact with the victim. See MCL 750.411i(1)(e).

### III. SPEEDY TRIAL

Next, defendant argues that he was denied his constitutional right to a speedy trial. We disagree.

## A. STANDARD OF REVIEW

We review de novo the constitutional issue whether defendant was denied his right to a speedy trial, and we review the trial court's factual findings for clear error. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). Additionally, "this Court must determine whether any error was harmless beyond a reasonable doubt." *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009). "Violation of the constitutional right to a speedy trial requires dismissal of the charge with prejudice." *Id*. at 664-665.

## B. ANALYSIS

The right to a speedy trial is guaranteed to criminal defendants by the United States Constitution and the Michigan Constitution as well as by statute and court rule. US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A); *Williams*, 475 Mich at 261. When determining whether a defendant has been denied the right to a speedy trial, the following four factors are balanced: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Williams*, 475 Mich at 261-262. The delay period commences at defendant's arrest. *Id*. at 261. Scheduling delays and delays caused by the court system are attributed to the prosecutor but should be "given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (cleaned up). Generally, delays sought by defense counsel are attributable to the defendant. *Vermont v Brillon*, 556 US 81, 90–91; 129 S Ct 1283; 173 L Ed 2d 231 (2009). A defendant can experience two types of prejudice while awaiting trial—prejudice to his person and prejudice to the defense. *Williams*, 475 Mich at 264 (cleaned up). Prejudice to the person results when pretrial incarceration deprives an accused of many civil liberties, and prejudice to the defense occurs when the delay might prejudice the defense. See *id*.; *People v Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997). Prejudice to the defense "is the more serious concern" to consider. *Williams*, 475 Mich at 264.

"[A] delay of six months is necessary to trigger an investigation into a defendant's claim of denial of the right to a speedy trial." *People v Walker*, 276 Mich App 528, 541; 741 NW2d 843 (2007), vacated in part on other grounds 480 Mich 1059 (2008). In this case, defendant was arrested on July 26, 2019 with regard to the charges in file number 19-008278-FH, and he was arrested on October 16, 2019 with regard to the charges in file number 20-003651-FH. The consolidated trial began on October 25, 2021. There was a 26-month delay in file number 19-008278-FH and a 24-month delay in file number 20-003651-FH. But the length of the delays is not dispositive, and these delays do not exceed the outer limits of delays in which this Court has found that the right to a speedy trial had not been violated. *People v Cain*, 238 Mich App 95, 112-113; 605 NW2d 28 (1999) (compiling cases with delays of 4.5 years, 31 months, 37 months, and 19 years). Nevertheless, because the delays were longer than 18 months, prejudice is presumed and we must examine the other factors to determine whether defendant was deprived of his right to a speedy trial. See *Williams*, 475 Mich at 262.

In considering the next factor—the reason for the delay—we must examine each period of delay and attribute each one to either the prosecutor or defendant, with unexplained delays attributed to the prosecutor. *Walker*, 276 Mich App at 541–542. A defendant's requests for adjournments, or stipulations to delays, are attributable to defendant, and time spent litigating a

defendant's motions is attributable to the defendant. See *Cain*, 238 Mich App at 113; *People v Hammond*, 84 Mich App 60, 67; 269 NW2d 488 (1978). Likewise, the withdrawal of defense counsel is a delay over which the prosecutor has no control. *People v Collins*, 388 Mich 680, 691; 202 NW2d 769 (1972). And, pertinent to this case, this Court has concluded that a delay due to our Supreme Court's decision to suspend jury trials in response to the COVID-19 pandemic is not attributable to either party. See *People v Witkoski*, 341 Mich App 54, 63; 988 NW2d 790 (2022) (concluding that delay caused by COVID-19 pandemic was excusable in the context of the 180-day rule); *In re Sanborn*, 337 Mich App 252, 270; 976 NW2d 44 (2021) ("[A]ny delay between the January 2020 hearing and the May 2020 hearing can be attributed to the unprecedented COVID-19 pandemic and not to the trial court.").

Defendant argues that three factors contributed to the delay: (1) his competency examination, (2) two instances of counsel withdrawal, and (3) the COVID-19 pandemic. While there was some delay attributable to defendant's competency examination, defendant consented to adjourning the hearing on the prosecutor's motion to determine competency and then consented to have the trial court determine competency on the basis of the examining doctor's report. Thus, while a portion of the delay is attributable to the prosecutor, a portion is attributable to defendant too. See *Hammond*, 84 Mich App at 67. Defendant also had two changes of counsel throughout the proceedings, which is outside the prosecutor's control and attributable to defendant. See *Collins*, 388 Mich at 691. Finally, the main reason for the length of the delay in this case was the COVID-19 pandemic shutting down the jury-trial system in March 2020, which is a valid reason for the delay. See *Witkoski*, 341 Mich App at 63; *In re Sanborn*, 337 Mich App at 270.

As to the third factor in this case—defendant's assertion of the right—defendant moved to dismiss on September 3, 2021, the trial court denied the motion on September 10, 2021, and trial began less than two months later on October 25, 2021. While defendant asserted his right to a speedy trial, he waited over 25 months to assert his right in file number 19-008278-FH and over 22 months to assert his right in file number 20-003651-FH. Defendant's decision to wait to assert his speedy-trial right does not weigh in his favor. Cf. *Cain*, 238 Mich App at 113-114 ("[W]e cannot ignore the fact that Cain waited eighteen months to assert her right to a speedy trial and that her trial commenced within nine months of when she asserted that right.").

The fourth factor evaluates the prejudice to the defendant. Defendant has not asserted that he was unable to secure witnesses or evidence for trial due to the delay. "[T]he most important thing is that there is no evidence that a fair trial was jeopardized by delay." *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) (involving 27 months' incarceration). Defendant also asserts that he suffered personal prejudice due to his long incarceration as a result of the delay. But this alone is not dispositive. When balanced with the other factors in this case, including defendant's delay in asserting his speedy-trial right and the valid reasons for delay, we find that defendant was not denied his right to a speedy trial, and he is not entitled to dismissal of the charges. See *Williams*, 475 Mich at 265; *Chism*, 390 Mich at 115-116.

## IV. OV 13

Finally, defendant argues that the trial court erred by assigning 25 points for OV 13 for his conviction of unlawful posting of message with aggravating circumstances. We disagree.

## A.  STANDARD OF REVIEW

Under the sentencing guidelines, a trial court's factual findings "are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016) (cleaned up). "A sentencing court may consider all record evidence before it when calculating the guidelines, including, but not limited to, the contents of a presentence investigation report, admissions made by a defendant during a plea proceeding, or testimony taken at a preliminary examination or trial." *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012) (cleaned up). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. (cleaned up).

## B.  ANALYSIS

Due process requires that a defendant be sentenced only on the basis of accurate information; therefore, "a sentence is invalid if it is based on inaccurate information." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997). OV 13 refers to defendant's "continuing pattern of criminal behavior." MCL 777.43(1). OV 13 is assigned 25 points if "the offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c). Alternatively, OV 13 is assigned 0 points if "no pattern of felonious criminal activity existed." MCL 777.43(1)(g).

Defendant did not object to the assignment of 25 points for OV 13 at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed with this Court. See *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018). See *People v Hershey*, 303 Mich App 330, 346; 844 NW2d 127 (2013), citing MCL 769.34(10). Therefore, defendant has not preserved this issue for appellate review. See *People v Chelmicki*, 305 Mich App 58, 69; 850 NW2d 612 (2014). "[T]his Court may review an unpreserved scoring issue for plain error affecting substantial rights." *Id*. (cleaned up). "To avoid forfeiture of the issue under the plain error rule, the defendant bears the burden to show that 1) error . . . occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (cleaned up; alteration in original). To prove that the plain error affected defendant's substantial rights "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. (cleaned up).

Defendant argues that OV 13 should have been assigned zero points because at least two out of the other three crimes against a person did not have sufficient evidence to sustain a conviction. Specifically, he maintains that there was insufficient evidence for the aggravated-stalking conviction in file number 19-008278-FH, the aggravated-stalking conviction in file number 20-003651-FH, and the conviction of use of a computer to commit a crime in file number 20-003651-FH. But we determined that sufficient evidence existed for all three of these crimes and defendant agrees that these crimes qualify as crimes against a person. Because defendant's conviction of unlawful posting of a message with aggravating circumstances was part of a pattern of felonious criminal activity involving three or more crimes against a person, OV 13 was correctly assigned 25 points. See MCL 777.43(1)(c). Accordingly, defendant's scoring issue lacks merit, and we deny relief on this issue.

We affirm defendant's convictions and sentences, but remand for the ministerial task of amending the judgment of sentence to correct the number of days of credit. See MCR 6.435(A). We do not retain jurisdiction.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Sima G. Patel